STATE OF CONNECTICUT *v.* ABRAHM HANNAH
(AC 27414)

Flynn, C. J., and Bishop and Borden, Js.

Argued September 6—officially released December 11, 2007

*Robert E. Byron*, special public defender, for the appellant (defendant).

*Sarah Hanna*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Abrahm Hannah, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8, and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). The defendant claims that (1) the trial court improperly excluded two cellular telephone recordings concerning the credibility of a prosecutorial witness and (2) the court's exclusion of the recordings and the court's limiting instructions on a third recording denied him the constitutional right to present a defense. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 9, 2003, at approximately 10 p.m., Dominique McClendon and Mercedes McClendon were sitting with Shameel Times (Wheatie)[1] on their grandmother's front porch at 116 Kent Street in Hartford. While they were talking, three armed men approached them. According to Mercedes McClendon, she recognized the defendant, also known as "Too Cool," among the men because she went to school with him and he was a friend of her child's father. One of the men, described as short with very dark skin, came onto the porch and started beating Wheatie with a gun, causing both Wheatie and Mercedes McClendon to fall to the floor. While the man continued to beat Wheatie, the gun went off, injuring Wheatie's pinkie finger.

After the gun went off, Dominique McClendon screamed at the men not to shoot her sister, jumped over the porch banister and ran around the side of the house. One of the men chased her, grabbed her shirt and took her hat. The man then let her go and ran back around to the front of the house where he joined the other two men. Together they started shooting down the street toward Albany Avenue.

Mercedes McClendon testified that after she and Wheatie had fallen to the ground, he held on to her as a shield while she struggled to escape. She managed to pull away from Wheatie and ran to the corner of the porch. After the gun went off, the man who was beating Wheatie stopped and ran off the porch. He and the defendant ran into the street to join the third man, and they all started shooting their guns in the direction of Albany Avenue. While the shooting continued, Mercedes McClendon ran inside the house.

As the defendant and the other two men were firing their guns down Kent Street, twelve year old Martin

---

[1] Times testified that his nickname is "Wheatie," and he is called Wheatie throughout the trial transcript.

McClendon was riding his bike up the same street toward them. Martin McClendon heard noises that he thought were firecrackers and saw some flashing lights ahead of him in the street. He kept riding and "didn't think anything of it" because he had heard fireworks earlier in the day. Then, Martin McClendon felt something hit his right leg and thought it was a rock. He got off his bike and ran back toward Albany Avenue. As he ran, he heard "things" fly past his head and hit poles around him. He ran to Albany Avenue where he collapsed. Martin McClendon realized that the "things" flying past him were bullets when he was told that he had been shot in the leg.

At trial, Mercedes McClendon testified that although she did not know the name of the man who had beaten Wheatie at the time, it was rumored that he was called "BK." On cross-examination, she stated that she did not know BK either before the shooting or at the time of her testimony. The defendant introduced his sole witness, Katari James, for the purpose of impeaching Mercedes McClendon's testimony. James testified that Mercedes McClendon had sexual relations with BK in 2005 while Mercedes McClendon was living with her. James also testified that Mercedes McClendon told her that the defendant was not present during the shooting.

As part of James' testimony, the defendant attempted to enter into evidence three short recorded segments of a single cellular telephone conversation that James had with Mercedes McClendon on September 28, 2005, one week prior to the defendant's trial. The recordings are of statements made only by Mercedes McClendon, as James' cellular telephone records only the caller's side of a conversation in fifteen second increments. In an offer of proof, all three conversations were played in their entirety. The court excluded the first two recordings, but the third tape was admitted for impeachment purposes along with the following transcription:

"Who? How he cover me, that don't make no sense, because by the time BK stop beating up on Wheatie, I was already off the porch, like running up in the door, and the was all . . . ."

The defendant was convicted on all counts and sentenced to the custody of the commissioner of correction for a total effective term of seventeen years imprisonment, suspended after ten years, with five years probation and 100 hours of community service for each year of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion by excluding the first two cellular telephone recordings. The court excluded the first two recordings because they were difficult to comprehend and one-sided and because the third recording accomplished the same purpose for which the other two recordings were offered. We decline to consider whether the court acted improperly in this case because the defendant failed to preserve the recordings for our review.

The appellant bears the burden of providing this court with an adequate record of review. Practice Book § 61-10. "The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. . . . Conclusions of the trial court cannot be reviewed where the appellant fails to establish through an adequate record that the trial court incorrectly applied the law or could not reasonably have concluded as it did . . . . The purpose of marking an exhibit for identification is to preserve it as part of the record and to provide an appellate court with a basis for review." (Internal quotation marks omitted.) *Finan* v. *Finan*, 100 Conn. App. 297, 308–309, 918 A.2d 910, cert. granted on other grounds, 282 Conn. 926, 926 A.2d 666 (2007); *State* v. *Calderon*, 82 Conn.

App. 315, 327 n.7, 844 A.2d 866, cert. denied, 270 Conn. 905, 853 A.2d 523, cert. denied, 543 U.S. 982, 125 S. Ct. 487, 160 L. Ed. 2d 361 (2004).

The defendant in this case failed to have the recordings marked for identification or transcribed on the record. "The failure to mark an exhibit for identification ordinarily precludes appellate review of its exclusion . . . . Exceptions have been made when there exists an adequate substitute in the record for the unmarked exhibit." (Citation omitted; internal quotation marks omitted.) *Weinberg* v. *Weinberg*, 89 Conn. App. 649, 655, 874 A.2d 321 (2005) (court's failure to mark notes from rabbinical court for identification was harmless as ample evidence existed to resolve issues); *Canton Motorcar Works, Inc.* v. *DiMartino*, 6 Conn. App. 447, 455–57, 505 A.2d 1255 (trial court did not err in refusing to mark disassembled automobile for identification as plaintiff's fifty photographs were adequate substitute), cert. denied, 200 Conn. 802, 509 A.2d 516 (1986).

Although the court held an extensive evidentiary hearing concerning the admissibility of the recordings, the content of each recording never was stated explicitly, and, in fact, there was never an agreement about what exactly was said. Furthermore, the defendant failed to request that a transcript be made of the recordings; he did not prepare a transcript of the recordings himself; he did not ask that the recordings be marked for identification; and he did not file a motion for rectification in order to correct the record. Because there is no factual record of the first two recordings, we decline to review this claim.

## II

The defendant next claims that the court's exclusion of the first two recordings and the limited admission of the third recording denied him his constitutional

right to present a defense. We limit our review of this claim to the third recording because, as discussed previously, the first two recordings are not part of the record.

The following facts are relevant to the defendant's argument. At the evidentiary hearing, the parties argued about the admissibility of the recorded portions of Mercedes McClendon's half of the cellular telephone conversation. Regarding the third recording,[2] the defendant argued that it should be admitted to impeach Mercedes McClendon's testimony that she did not know BK, both at the time of the shooting and at the time of trial, and that she was still on the porch when the individual finished beating Wheatie and the shooting in the street began. The state objected to the admission of the recordings in general because (1) the language was difficult to decipher, (2) the context of the statements was vague, as only Mercedes McClendon's half of the conversation was recorded, (3) to the extent that some statements could be deciphered, they were not inconsistent with Mercedes McClendon's testimony, (4) it was not clear that the BK in the recording was the same BK who Mercedes McClendon referred to in her testimony and (5) the third recording was an incomplete statement.

In order to address these concerns and similar concerns raised by the court, James was questioned further about the third recording:

"The Court: Do you recall the question that you asked her or the things you said to her immediately before that statement?

"[The Witness]: Before which statement?

"The Court: The third one.

---

[2] As stated in part I, the court excluded the first two recordings because of questions about their reliability.

"[The Witness]: What I asked her? No. What I said was, how you know who shot little Martin? She said [because] she was off the porch, then it was like a pause. And the pause was when I was saying something. I don't know for sure. It's—how they put it in words, it was—she said—I said to he—no, I said what happened, how did you see who was shooting? And right when it was cut off, she was, like, and that's when she said, I never said Too Cool was there, and, Too Cool did not shoot little Martin. They got my statements wrong.

"The Court: That's not on the tape, correct?

"[The Witness]: Yeah. Nope. It didn't record. It only records fifteen seconds of conversation."

The court then made the following ruling: "I'm not going to let this tape recording in. I'm going to allow you to question her about the conversation, and, depending on the cross-examination, I may let you offer a portion of it in evidence to bolster her claim if she's attacked on that level by the state's attorney. But it's apparent to me that the point that you wished to establish with respect to knowledge of BK as of the time, there is no foundation for that, either in the statements which went up to it or in her personal knowledge because she doesn't offer any. And that was the one primary use of the actual hearing of the recording itself."

The defendant objected to the court's narrow interpretation of the third recording, arguing that it also contradicted Mercedes McClendon's testimony that she was still on the porch at the time of the shooting. The court asked James to clarify exactly what she asked Mercedes McClendon that elicited the third statement:

"The Court: Was it a question about Wheatie covering her, which was the question that led to that particular answer?

"[The Witness]: It was where was—no, Wheatie was suppose to have been covering you, that's what it was, Wheatie was suppose to have been covering you, so how did you see who was shooting. She was, like, no, by time BK finished stop beating Wheatie up, she was already off the porch."

The court then amended its ruling to allow the third recording for the limited purpose of impeaching Mercedes McClendon's testimony as to her knowledge of BK and where she was when the three individuals were shooting down the street.

With the jury present, James offered the following testimony. Three months after the shooting, Mercedes McClendon referenced BK in a conversation with James. In March or April, 2005, Mercedes McClendon was having a sexual relationship with BK while she was living with James. Subsequently, on September 28, 2005, James spoke with Mercedes McClendon on the telephone and recorded Mercedes McClendon's half of the conversation in fifteen second intervals. During the conversation, James asked Mercedes McClendon "what had happened, and it was said that Wheatie was covering her. So, she didn't know who was shooting." Mercedes McClendon responded, "Who? How he cover me, that don't make no sense, because by the time BK stop beating up on Wheatie, I was already off the porch, like running up in the door, and the was all . . . ." In addition, James testified that Mercedes McClendon stated that "she never told anybody Too Cool was there or Too Cool did any shooting" and that "the report that the attorneys have is not the report that she gave to the police stating that Too Cool was at the incident. She said she never said Too Cool was at the incident and Too Cool wasn't there. And she said she knows BK did it and BK need to stand up to the plate and say he did it."

The court then instructed the jury: "Ladies and gentlemen, I am going to indicate to you that the statement there that you heard, that one snippet of recorded telephone conversation, is introduced . . . for the limited purpose of indicating that it was uttered just as the other ones we talked about in the past. It was not introduced to prove the truth of its contents, the truth of what was stated in that recording. And as a matter of fact, it's only introduced for the purpose of showing, if you find that it is so, material inconsistency between that statement and the trial testimony of Mercedes McClendon. It will be up to you to determine whether it is materially inconsistent with that testimony. It will be up to you to determine if it is, whether or not to draw an adverse inference to her credibility based upon it. . . . [A]gain, understand it is not introduced for the truth of its contents. Only to show it was uttered as a prior inconsistent statement if you so consider it on the question of credibility of Mercedes McClendon." Both parties responded that they had nothing further, and the defendant rested.

The defendant claims that the court's limiting instruction denied him the constitutional right to make a defense as provided for by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. See *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002) (reaffirming defendant's fundamental right to present defense). Because the defendant is claiming a constitutional error that was not preserved at trial, he seeks review in accordance with *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the

claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id., 239–40.

The defendant's claim passes the first prong of the *Golding* test. This recording was entered properly into evidence, a transcript was made of the recording and the transcript of the evidentiary hearing was submitted for this court's review. Therefore, the record is adequate to review the claim of error.

The second prong of *Golding* requires that a claim be of constitutional magnitude. The defendant contends that his constitutional right to present a defense was violated solely by the court's failure to admit the third recording substantively. Because the third recording was a hearsay statement, in order to be admitted for substantive purposes, it must fall under one of the exceptions to the hearsay rule. The defendant argues that the third recording should be admitted as a prior inconsistent statement pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). In *Whelan,* our Supreme Court adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753.

Our case law concerning the nature of a *Whelan* statement is well established; *Whelan* statements are evidentiary matters and not of constitutional magnitude. *State v. Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991) ("court's failure to give the requested *Whelan* charge was an evidentiary error that did not involve the violation of a constitutional right"); *State v. Holloway*, 209 Conn. 636, 649–50, 553 A.2d 166 ("[w]e do not discern the *Whelan* change allowing the substantive consideration of prior inconsistent statements to be a change of constitutional dimension"), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State v. Holbrook*, 97 Conn. App. 490, 499, 906 A.2d 4 (*Whelan* claim evidentiary in nature), cert. denied, 280 Conn. 935, 909 A.2d 962 (2006); *State v. Daniels*, 83 Conn. App. 210, 214–17, 848 A.2d 1235 (court's exclusion of prior inconsistent statement did not preclude defendant from presenting defense and did not warrant *Golding* review as statement was "essentially evidentiary issue"), cert. denied, 270 Conn. 913, 853 A.2d 528 (2004); *State v. Bryant*, 61 Conn. App. 565, 568–71, 767 A.2d 166 (2001) (*Golding* review unavailable for defendant because no authority supports claim that admittance of *Whelan* statement is constitutional violation). Accordingly, the defendant's claim fails to satisfy the second prong of *Golding* and is not reviewable.

The defendant contends, however, that even if the limiting instruction was an evidentiary ruling, it was so debilitating to his ability to present a defense that it amounted to a constitutional violation. We disagree and note that the defendant was allowed to use the third recording to impeach Mercedes McClendon's testimony that she did not know BK and that she was present on the porch when the shooting happened in the street. Moreover, the defendant cross-examined Mercedes McClendon and further impeached her testimony

through his direct examination of James. "The defendant's sixth amendment right [to present a defense], however, does not require the trial court to forgo completely restraints on the admissibility of evidence." (Internal quotation marks omitted.) *State* v. *Cerreta*, supra, 260 Conn. 261. "[I]t would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 61 Conn. App. 571. The defendant was not denied the right to present his defense.

The judgment is affirmed.

In this opinion the other judges concurred.